UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

| | |
|---|---|
| MARIA BONIFACE, individually and as next best friend of DREW BONIFACE )<br>*Plaintiffs*, )<br> )<br>v. )<br> )<br>VAIL RESORTS, INC., )<br>VAIL RESORTS MANAGEMENT CO., )<br>MOUNT SNOW, LTD, and )<br>NATIONAL SKI AREAS ASS'N, )<br>*Defendants*, ) | **COMPLAINT and<br>DEMAND FOR TRIAL BY JURY** |

NOW COME Plaintiffs, Maria Boniface, individually and as next best friend of Drew Boniface, by and through their attorneys, Costello, Valente & Gentry, P.C., and hereby complain against the above-named defendants as follows:

## INTRODUCTION

1. It has been well known for decades that a head-first fall onto a hard surface creates a significant risk of a severe, permanent spinal injury.

2. Organizations and entities involved in activities during which participants perform inverted maneuvers have generally taken measures to minimize the foreseeable risk of spinal injuries from those maneuvers, especially for youth participants.

3. However, the ski industry has knowingly increased the risk of spinal injuries to youth participants because large terrain parks without rules attract young skiers and their families.

4. One example was 15-year-old Plaintiff Drew Boniface (hereinafter "Drew"). Without training or supervision, Drew attempted a backflip using a terrain feature designed to propel skiers high into the air to perform tricks, including inverted maneuvers, and landed on his head. As a result, Drew will spend the rest of his life paralyzed from the chest down.

COSTELLO,
VALENTE
& GENTRY, P.C.

51 PUTNEY ROAD
P.O. BOX 483
BRATTLEBORO,
VERMONT
05302

802-257-5533

1

## JURISDICTION and VENUE

5. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6. Venue is proper pursuant to 28 U.S.C. § 1391(b) because Drew was injured in the District of Vermont.

## PARTIES

7. Plaintiffs Maria Boniface (hereinafter "Maria") and Drew are residents of Pound Ridge, New York. Maria is Drew's mother; Drew is 16 years old.

8. Defendant Vail Resorts, Inc. and Defendant Vail Resorts Management Company (hereinafter referred to jointly as "Vail") are related foreign corporations which do business in the District of Vermont, with offices and principle places of business located in Broomfield, Colorado. Vail operates dozens of ski areas and is recognized as the largest ski conglomerate currently in operation.[1]

9. Defendant Mount Snow, LTD. (hereinafter "Mount Snow") is a domestic corporation owned by Vail which, on information and belief, works with Vail to operate the ski resort in West Dover, Vermont where Drew was injured. Its offices and principal place of business are in Broomfield, Colorado.

10. On information and belief, Vail and Mount Snow were responsible for ensuring the safety of terrain park users at Mount Snow on March 1, 2025.

11. Defendant National Ski Areas Association (hereinafter "NSAA") is a nonprofit foreign trade organization with an office and principle place of business in Lakewood, Colorado.

---

[1] *See* Lion, Gatean, "The Economics of the US Ski Business," Medium (Feb. 15, 2025), available at: https://medium.com/@gaetanlion/the-economics-of-the-us-ski-business-bcef0b0795a7.

In relevant part, it undertakes efforts to define technical and operational standards related to skier safety, including by establishing for guidelines terrain park safety.

## BACKGROUND

*Inverted maneuvers were never an inherent risk of skiing. They were banned due to injury risk.*

12. Falling onto one's head from a height of only a few feet can easily cause a cervical spine injury that results in paralysis or death.[2]

13. In the 1950s, Stein Eriksen pioneered inverted aerial maneuvers in skiing.[3]

14. At that time, ski resorts did not construct "jumps," half-pipes, or other features to enable skiers to jump high into the air to perform tricks, except in connection with competitions and shows.

15. In the 1960s and 1970s, "hot-dog" skiing became popular, and resorts hosted competitions at which competitors performed flips, spins, and other aerial tricks.[4] The features for these competitions were not, however, accessible to the skiing public.

16. In March 1973, "hot-dog" freestyler Scott Magrino attempted a double backflip at a mogul event at Vail.[5] He landed on his head, causing a spinal injury that paralyzed him.

17. As a result, Vail and the governing body for freestyle skiing immediately banned inverted maneuvers, even for advanced competitors.[6]

---

[2] *See, e.g.,* Waseem, Muhammad *et al.*, "Cervical Injury," NIH National Library of Medicine (June 2, 2025), available at https://www.ncbi.nlm.nih.gov/books/NBK448146/.
[3] *See* Lexi Local, "Stein Eriksen: The Godfather of Freeskiing," Ski Utah (May 7, 2021), available at: https://www.skiutah.com/blog/authors/lexi-stein-eriksen-the-godfather-of/.
[4] *See* Wallace, William, "Hot-Dog Skiing: New Twist," New York Times (Mar. 25, 1973).
[5] Moguls are small bumps on the trail that naturally result from skier traffic. They can also be man-made. At the dawn of the "hot-dog" craze, resorts built small ramps (now referred to as "kickers") within the moguls to enable freestyle competitors to race down the moguls and attempt 2-4 tricks at the kickers placed at various points on the trail.
[6] *Id.; see also* LaConte, John, "Time Machine: 50 years ago, double backflip gone wrong leads to Vail Mountain ban on inverted aerials," Vail Daily (Mar. 13, 2023).

COSTELLO, VALENTE & GENTRY, P.C.
51 PUTNEY ROAD
P.O. BOX 483
BRATTLEBORO, VERMONT 05302
802-257-5533

18. In the words of Vail's then-Chairman: "it's about time someone said 'stop.'"[7]

19. Inversions were also banned for members of the public at most resorts.

20. In 1980, a four-year retrospective study determined zero incidents of spinal injuries had occurred involving freestyle competitors. It was obvious that limiting inversions had substantially reduced the risk of cervical spine injuries.[8]

21. The ban on inverted maneuvers was adopted by the International Ski Federation (known as the "FIS"), which for all intents and purposes governs ski competition worldwide, and it remained in place until 2002.[9]

22. The ban reflected a growing understanding about the risk of spinal injuries associated with high-flying inverted activities, especially to young participants, who are more inclined to engage in risk-taking due to their underdeveloped prefrontal cortex.[10]

23. For example, in 1976, standards were established that eliminated diving boards in shallow pools nationwide.[11] In 1977, the American Academy of Pediatrics identified trampolines as a leading cause of youth quadriplegic injuries, revolutionizing their design.[12] In 1981, standards limited the height of playground equipment and required soft surfaces.[13] Also in

---

[7] See LaConte, *supra*.
[8] See Dowling, PA, "Prospective study of injuries in United States Ski Association freestyle skiing—1976 to 1980," Am. J. Sports Med. (Sep. 1982) at 268.
[9] See Team GB, "Explained: Freestyle Skiing," available at: https://www.teamgb.com/article/explained-freestyle-skiing-or-team-gb/5ttMbMv1dYww2GU2DdJu5o#:~:text=As%20the%20sport%20gathered%20momentum,standards%20to%20regulate%20the%20sport (undated).
[10] See Dartmouth College, "Risk-taking behavior in teens caused by imbalanced brain activity," ScienceDaily (Oct. 2016), available at: https://www.sciencedaily.com/releases/2016/10/161017105555.htm#:~:text=Adolescent%2Dspecific%20behavior%20may%20be,role%20in%20reward%2Dseeking%20and.
[11] See *Meneely v. S.R. Smith*, Inc., 101 Wn. App. 845, 847 (2000) (chronicling history of diving board safety standards.
[12] See Holyroyd, J. *et al.*, "Trampolines II," Am. Acad. Ped. (Mar. 1981) at 1.
[13] See Creative Recreational Systems, "Playgrounds Through Time: How Safety Standards Have Evolved," (undated), available at: https://www.creativesystems.com/playgrounds-through-time-how-safety-standards-have-evolved/.

4

the 80s, gymnastics and cheerleading organizations banned dangerous maneuvers, instituted standards for padded facilities, and required proficiency and a spotter to perform inversions.[14]

*Inverted maneuvers remain dangerous but become profitable.*

24.     In the early 1990s, snowboarding exploded in popularity. This led resorts to build terrain parks to enable boarders to jump high into the air to do tricks.[15] A representative image of a terrain park feature built by a resort as it is used by a boarder is below:



---

[14]     *See* Walsh, Michael, "The Korbut Flip," NY Daily News (Aug. 12, 2012); and International Gymnastics Federation, 2017-2020 Code of Points (2020) at 39. *See also* USA Gymnastics ("USAG") Rules & Policies at Ch. 10 (establishing training requirements); Program Optional Code of Points at § 1 (penalties for safety violations); USAG Apparatus Spec. Rule 11.2 and 11.4 (equipment and mat requirements); and National Fed. Of State High School Associations ("NFHS") Rule Book at § 6 and 9 (risk minimization); NFHS Spirit Rules Book at Rule 3, § 5 (limiting downward inversions) and USAG Safety/Risk Management Certification R101 (requiring USAG coaches to learn duty to supervise and duty to warn regarding inherent risk of "head-over-heels" rotations); and Thomas, Robert, "New Heights, and Dangers, for Cheerleaders," New York Times (Nov. 15, 1986).

[15]     *See* Greenwood, Ian, "Why Freeskiing Exploded in the 90s—Mike Douglas Turns Back the Clock," Powder (Aug 16, 2025), available at: https://www.powder.com/skiers/freeskiing-history-90s.

COSTELLO, VALENTE & GENTRY, P.C.
51 PUTNEY ROAD
P.O. BOX 483
BRATTLEBORO, VERMONT
05302
802-257-5533

25. In the beginning of the era of terrain parks, inverted maneuvers were banned, including at Mount Snow, which used ropes and gates at the entrance of its "Un Blanco Gulch" park to force each user to pass signs announcing, "NO INVERTED MANEUVERS."

26. At the time, the FIS had begun to allow inverted maneuvers in competitions, and ESPN's "Winter X-Games" popularized a competition to perform the most difficult tricks in the park and halfpipe. It wasn't long before young skiers wanted to try those tricks themselves.

27. Attracting young terrain park users benefits ski resorts in several ways that are particularly applicable to Vail and Mount Snow. Doing so gives resorts a "cool factor" that is essential in a lifestyle sport. It contains large crowds on a small portion of the mountain and overcomes limitations in altitude and natural snow. Terrain park videos and photos are widely shared on social media. And roughly 85% of park users purchase season passes compared to half of other skiers—which is Vail's most significant source of revenue.[16]

28. Vail thus rescinded the ban on inverted maneuvers in February of 2003 for its four Colorado resorts. Because of Vail's status as the pre-eminent ski area in the country, other ski areas followed, including Mount Snow later the same year. Vail's COO, Bill Jensen, said the decision was to "embrace the evolution of the sport," which commentators understood as a pivot to attract the growing generation of young skiers and snowboarders who favored terrain parks.[17]

*Efforts to artificially limit liability despite increasing risk to young skiers*

29. The potential exposure to liability from Vail's decision was significant. Vail and Mount Snow needed to rationalize allowing an obviously dangerous activity while building larger and larger man-made features to increase that danger.

---

[16]   See SIA 2023/23 Snowsports Participation Study ("Core vs. Casual Participation").
[17]   See Guy, Jr., Andrew, "Vail Resorts to allow backflips in parks," Vail Daily (Feb. 2003); and Blevins, Jason, "Vail Oks backflips, inverted maneuvers," Denver Post (Feb. 2003).

6

30. The task of doing so was undertaken by the NSAA and Vail.

31. Although the NSAA holds itself out as a safety organization, that is only partially accurate. One of the NSAA's primary objectives is to limit ski areas' exposure to liability.

32. Vail is inextricably intertwined with the NSAA. In the two years prior to the incident that gave rise to the case at bar, the NSAA's Board of Directors was chaired by Pat Cambell, who had overseen Vail's operations from 2015-21.[18] In 2024, Mike Reitzell, a former Vail Vice President, was named NSAA's President and CEO. Managers or officers of Vail and the NSAA participated in, authorized, or ratified the actions discussed below.

33. When Vail rescinded its ban, the NSAA modified its directives so that they no longer recommended banning inverted maneuvers. There was no safety-related rationale for doing so—it was solely to avoid liability.

34. In place of the ban, the NSAA created a recommended program called "SMART" which many resorts, including Vail and Mount Snow, adopted. Participating resorts post signs at the entrance of their terrain parks which are reproduced below.



35. The NSAA also created signage informing skiers about the size of features, and that they entered at their own risk of serious injury or death, as reproduced below:

COSTELLO, VALENTE & GENTRY, P.C.
51 PUTNEY ROAD
P.O. BOX 483
BRATTLEBORO, VERMONT
05302
802-257-5533

---

[18]   See Vail Resorts, "Patricia A. Cambell, Strategic Advisor," available at: https://corporate.andermatt-swissalps.ch/wp-content/uploads/sites/2/2025/07/Bio_Pat_Campbell.pdf (undated).

 

36. The NSAA program and signage was inadequate to addresses the risks of inverted maneuvers and failed to direct terrain park users how, where, or when to attempt (or refrain from attempting) inverted maneuvers.

37. The NSAA program failed to incorporate any limitation on inverted maneuvers for park users based on their age, skill level, understanding of inverted maneuvers, or parental supervision.

38. The NSAA program failed to adopt standards to ensure that the terrain park features being built were not unnecessarily dangerous for those attempting inverted maneuvers.

39. The SMART program signs were in place at Mount Snow on the day of the incident which gave rise to the case at bar.

40. Many resorts declined to adopt the NSAA program and continue to ban inversions, including Bromley Mountain, Cochran's Ski Area, Whistler/Blackcomb (unless qualified by a certified coach), Sierra-at-Tahoe, Winter Park, Stevens Pass, Shawnee Mountain, White Pass, Mt. Shasta, Cypress Mountain, Boreal Mountain, Holiday Valley, Plattekill Mountain, Thunder Ridge, Bristol Mountain, Beech Mountain, Titus Mountain, Mount Peter, Poley Mountain, Ober Mountain and Gunstock. The province of Quebec bans inverted maneuvers at all resorts.

COSTELLO,
VALENTE
& GENTRY, P.C.
51 PUTNEY ROAD
P.O. BOX 483
BRATTLEBORO,
VERMONT
05302
802-257-5533

41. As a result of the ban being lifted at many areas, skiers have suffered more frequent spinal injuries, even though other injury types have become less common in the same time period.[19] As one article noted, "epidemiologic studies of injuries at ski resorts have found that terrain parks, and jumps especially, pose a significantly greater head/neck injury risk to resort patrons than normal skiing activities. One especially hazardous situation is when the jumper lands in an inverted position…"[20] The most injured subgroup is 13- to 24-year-old terrain park users who owned their equipment and wore a helmet.[21]

42. Jumping is the primary cause of spinal injuries in skiers and snowboarders, and researchers have recommended educating skiers on techniques for safe jumping, but the NSAA has not incorporated this in its program.[22]

43. The Director of the Shepherd Center, a specialty care facility for spinal injuries, observed that: "Resorts have opened more dangerous trails and are accused of propagating the risk-taking skier/boarder mentality with sponsorships and promotions of ever-more dangerous flips and tricks."[23]

44. Sports safety researchers have noted "high injury rates" in terrain parks with

---

[19]   *See* Levy, A. and Smith, R., "Neurologic Injuries in Skiers and Snowboarders," Semin. Neurol (2000) at 233.
[20]   *See* McNeill, James, The Inverting Effect of Curvature in Winter Terrain Park Jump Takeoffs," (Oct. 2011), at 1.
[21]   *See* Bigdon, S. *et al*, "Spinal injury in alpine winter sports: a review," Scan. Jou. Trauma, Res. And Em. Med. (2019) at 69, available at: https://link.springer.com/content/pdf/10.1186/s13049-019-0645-z.pdf.
[22]   *See* Tarazi, F. *et. al.*, "Spinal Injuries in skiers and snowboarders," Am. J. Sports Med. (Mar. 1999) at 177.
[23]   *See* Harrington, Emma, "A culture of risk-taking can lead to brain and spinal cord injuries in winter sports," Shepard Center (Jan 2024), available at: https://news.shepherd.org/a-culture-of-risk-taking-can-lead-to-brain-and-spinal-cord-injuries-in-winter-sports/#:~:text=Often%2C%20people%20are%20surprised%20to,increase%20in%20risk%2Dtaking%20behaviors..

COSTELLO, VALENTE & GENTRY, P.C.

51 PUTNEY ROAD
P.O. BOX 483
BRATTLEBORO, VERMONT
05302

802-257-5533

jumps "considered a key risk factor."[24]

45. The only way resorts that lifted the ban on inverted maneuvers can continue to avoid liability is if no governing body adopts standards for terrain park safety.

46. To that end, Vail and the NSAA have undertaken to interfere with and delay the establishment of safety standards by the American National Standards Institute (hereinafter "ANSI").

47. ANSI standards are generally developed by a consensus standard involving all "directly and materially interested" parties.[25] This means that any participant in the development of ANSI standards effectively has veto power.

48. ANSI standards for snow sports are overseen by Committee F27.

49. The identity of the members of F27 is not public except for its officers, who are all related to Vail or the NSAA or engaged in activities related to reducing ski area liability.

50. The Chair of F27 is Dr. Irving Scher, an accident reconstructionist and biomechanical engineer who has served as a defense expert witness in 79 cases.[26] In relevant part, Dr. Scher was retained as an expert for Vail in *Grajeda v. Vail Resorts, Inc.* in 2024, where portions of his testimony were excluded by this Court.[27]

51. The Vice-Chair of F27 is Earl Saline, whose primary occupation is as part of the leadership of the NSAA.

COSTELLO, VALENTE & GENTRY, P.C.
51 PUTNEY ROAD
P.O. BOX 483
BRATTLEBORO, VERMONT 05302
802-257-5533

---

[24] See Wolfsperger, F. *et al.*, "Towards more valid simulations of slopestyle and big air jumps: Aerodynamics during in-run and flight phase," at 1 J. Sci. and Med. In Sport (May 2021), available at: https://www.researchgate.net/publication/351682891_Towards_more_valid_simulations_of_slopestyle_and_big_air_jumps_Aerodynamics_during_in-run_and_flight_phase.

[25] See "ANSI Introduction," American National Standards Institute, available at: https://ansi.org/american-national-standards/ans-introduction/overview (undated).

[26] See Expert Radar, "Dr. Irving Scher," available at: https://www.expertinstitute.com/experts/dr-irving-sanford-scher-72042/ (undated).

[27] See Entry Order dated July 27, 2023 at 12-15 (Doc. 126), *Grajeda v. Vail Resorts Inc. et al*, Case No.: 2:20-cv-00165-cr.

52. The Recording Secretary of F27 is Paul Rosenlund, a prominent trial lawyer whose "practice primarily involves representing business interests," and who has defended "dozens of ski and snowboard liability suits" on behalf of NSAA. Mr. Rosenlund has also written and spoken for the NSAA.[28]

53. The Membership Secretary of F27 is Mistica Walker, a claims adjuster for Wells Fargo, which insures roughly half of the ski resorts in the U.S.[29]

54. None of the known members of F27 are experts in the design of terrain parks or safe use thereof by young skiers.

55. The ASTM F27 subcommittee began working on standards for terrain park safety in 2011, but no standards have been established.[30]

56. There is no explicable reason that it should take 15 years to adopt standards for terrain park safety. For reference, it took two years to update standards for trampoline parks, one year for zip lines, and two years for artificial turf fields.[31]

57. The only reasonable explanation is that Vail and the NSAA want to avoid creating a standard because they know their current allowance of unsupervised inverted maneuvers by children of all ages is unsafe and indefensible, so they are using their veto power to delay the same.

*Circumstances of Drew's injuries*

---

[28]   *See* Duane Morris LLP, "Paul Rosenlund," available at: https://www.duanemorris.com/attorneys/paulsrosenlund.html (undated).
[29]   *See* Oliver, Peter, "Injury News: No Trend is a Good Trend," Ski Area Management (Jan. 2013), available at: https://www.saminfo.com/archives/2010-2017/2013/january-2013/injury-news-no-trend-is-a-good-trend.
[30]   *See* SAM Headline News, "Will ASTM F27 Expand Its Scope to Terrain Parks," SAM News (Aug. 2011), available at: https://www.saminfo.com/news/sam-headline-news/5919-996-will-astm-f27-expand-its-scope-to-terrain-parks.
[31]   *See* ASTM F3557, F2970, F2959, and F2333.

COSTELLO, VALENTE & GENTRY, P.C.
51 PUTNEY ROAD
P.O. BOX 483
BRATTLEBORO, VERMONT
05302
802-257-5533

11

58. On March 1, 2025, Drew was skiing in the terrain park at Mount Snow known as "The Farm," which Mount Snow indicated contained "Medium" features. Managers or officers of Vail or Mount Snow participated in, authorized, and ratified all conduct related to this area.

59. The only warning signs directed Drew to work his way up from small to large features, make a plan for each trick, look before jumping, respect other users, and try to land on his feet, consistent with the NSAA's SMART program.

60. Drew was 15 years old.

61. No representatives for Mount Snow or Vail were supervising the use of the park.

62. There was no way for Drew to know whether it was dangerous for him to perform inverted maneuvers from the warning signs.

63. Drew was nevertheless permitted by Vail and Mount Snow to attempt inverted maneuvers without regard for his age, skill, or supervision.

64. Drew attempted a backflip on one of the jumps built by Mount Snow.

65. The angle of the jump caused Drew to fly high in the air, beyond the designed landing area.

66. As a result, instead of completing one backflip and landing on a steep slope his skis, Drew completed one-and-a-half backflips and landed on a flat slope on his head.

67. As a result, Drew suffered pain and injury including paralysis from the chest down and emotional distress. His injuries are permanent and continuing. Drew's past and future medical costs are substantial, and his lifetime income potential has been substantially diminished. Drew's father passed away a year earlier, which means that Maria will have to become Drew's full-time support person indefinitely, and she has or will suffer lost wages, loss of enjoyment of life; loss of services, loss of companionship, and emotional distress.

COSTELLO,
VALENTE
& GENTRY, P.C.

51 PUTNEY ROAD
P.O. BOX 483
BRATTLEBORO,
VERMONT
05302

802-257-5533

## COUNT I – Premises Liability / Negligence

68. Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

69. Vail and Mount Snow had a duty to Plaintiffs to maintain its premises in a reasonably safe condition and protect him from enhance risks that go beyond risks that are "obvious and necessary" to the sport of skiing.

70. Vail and Mount Snow breached that duty by designing a jump that caused Drew to "overshoot" the landing area into a flat, high-impact zone; failing to supervise the terrain park to prevent young skiers from attempting inverted maneuvers without oversight or instruction; and failing to implement any vetting or proficiency assessment system.

71. As a result, Plaintiffs were injured as set forth in Paragraph 67.

## COUNT II – Negligent Design and Maintenance

72. Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

73. The feature used by Drew was defectively designed such that the force exerted upon users was likely to exceed human limits.

74. As a result, the feature was like a hidden trap, and there was no way for Drew to avoid "overshooting" the landing other than using the feature and exposing himself to injury.

75. As a result, Plaintiffs were injured as set forth in Paragraph 67.

## COUNT III – Failure to Warn

76. Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

77. Vail and Mount Snow knew that features like the one used by Drew are likely to cause catastrophic spinal injuries.

78. Vail and Mount Snow's reliance on the NSAA's "SMART" program was inadequate to warn Drew, because it failed to disclose the dangers posed by the design of the

COSTELLO, VALENTE & GENTRY, P.C.
51 PUTNEY ROAD
P.O. BOX 483
BRATTLEBORO, VERMONT
05302
802-257-5533

jump, or the specific risk of spinal injury associated with inverted maneuvers.

79. As a result, Plaintiffs were injured as set forth in Paragraph 67.

**COUNT IV – Negligent Undertaking by NSAA and Vail**

80. Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein

81. The NSAA undertook the responsibility to provide safety guidelines to its members, including Vail and Mount Snow.

82. The NSAA and Vail undertook to interfere with the adoption of reasonable safety standards by the ASTM.

83. The NSAA and Vail breached their duty to the public and to Drew by intentionally delaying and blocking the adoption of reasonable safety standards for terrain parks, even though both entities were well aware of the dangers posed by inverted maneuvers therein, especially to young users.

84. The delay and blocking effort by the NSAA and Vail were a strategic effort to avoid defining a standard of care that would expose NSAA members or Vail to liability for conduct they knew increased the risk of harm to skiers, especially young terrain park users.

85. The failure by the NSAA and Vail to recommend any sort of restriction on inverted maneuvers for children, no matter how young, unskilled, or inexperienced, directly contributed to Drew's access to the feature that injured him.

86. This was in part because it was beyond Drew's developmental capacity to evaluate the risk posed by the feature.

87. As a result, Plaintiffs were injured as set forth in Paragraph 67.

**Count V – Gross Negligence by NSAA and Vail**

88. Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

COSTELLO, VALENTE & GENTRY, P.C.
51 PUTNEY ROAD
P.O. BOX 483
BRATTLEBORO, VERMONT
05302
802-257-5533

89. The foregoing actions by the NSAA and Vail demonstrated a reckless disregard for the safety of minor skiers by inviting them to perform high-risk maneuvers on features the NSAA and Vail knew were unsafe.

90. The NSAA and Vail acted with a reckless and wanton disregard for Drew's physical safety and legal rights, manifesting an indifference to him that was outrageously reprehensible. Their decision to block safety standards and ignore the known risk of serious spinal injury to become more popular with young skiers was so egregious that it shocks the conscience and is beyond what any reasonable person would consider acceptable for a public-facing recreational facility.

91. As a result, Plaintiffs were injured as set forth in Paragraph 67.

92. Punitive damages are necessary to punish the NSAA and Vail and to deter others in the ski injury from similar conduct in the future.

WHEREFORE, Plaintiffs respectfully request that the Court grant compensatory damages, punitive damages, fees, costs, and whatever further relief it deems appropriate.

## REQUEST FOR TRIAL BY JURY

NOW COME Plaintiffs and request a trial by jury.

COSTELLO,
VALENTE
& GENTRY, P.C.

51 PUTNEY ROAD
P.O. BOX 483
BRATTLEBORO,
VERMONT
05302

802-257-5533

DATED at Brattleboro, County of Windham and State of Vermont, this 2nd day of March, 2026.

        MARIA BONIFACE, individually and
as next best friend of DREW BONIFACE,
Plaintiffs,

By:    */s/ James A Valente*
       James A Valente, Esq.
       COSTELLO, VALENTE & GENTRY, P.C.
       Attorneys for Plaintiffs
       51 Putney Rd., P.O. Box 483
       Brattleboro, VT 05302
       802-257-5533
       valente@cvglawoffice.com

COSTELLO, VALENTE & GENTRY, P.C.
51 PUTNEY ROAD
P.O. BOX 483
BRATTLEBORO, VERMONT 05302
802-257-5533